## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                  No. CR 12-3013 JB/CG

ALFONSO THOMPSON,

      Defendant.

### MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the Defendant's Motion for Compassionate Release, filed January 6, 2021 (Doc. 140)("Motion").  The Court held a hearing on January 31, 2022.  See Clerk's Minutes, filed January 31, 2022 (Doc. 151).  The primary issues are: (i) whether Defendant Alfonzo Thompson has exhausted his administrative remedies, where Thompson filed an Inmate Request for compassionate release and the warden denied his request or did not reply within thirty days; (ii) whether Thompson's pulmonary sarcoidosis, sleep apnea, and seizure disorder in addition to the heightened risk of severe COVID-19 infection these conditions present constitute extraordinary and compelling reasons warranting his release; (iii) whether a reduction in Thompson's sentence is consistent with applicable policy statements from the United States Sentencing Commission ("Sentencing Commission"); and (iv) whether a sentence reduction aligns with the applicable 18 U.S.C. § 3553(a) factors.  The Court concludes that: (i) Thompson has

---

[1]In its Sealed Memorandum Opinion and Order, filed March 18, 2024 (Doc. 156)("Sealed MOO"), the Court requested that the parties propose redactions, if any are necessary to protect confidential information.  See Sealed MOO at 1 n.1.  The Court gave the parties fourteen calendar days to provide notice of any proposed redactions.  See Sealed MOO at 1 n.1.  The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions.  Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

exhausted his administrative remedies, because the warden has not replied to Thompson's request for compassionate release, despite that more than thirty days have elapsed since Thompson made his request; (ii) Thompson's case does not present extraordinary and compelling reasons warranting his compassionate release under 18 U.S.C. § 3582(c)(1)(A) and the reduction of his fifteen-year sentence, because Thompson already has contracted COVID-19, at which time Thompson had a mild case of the illness, and Thompson refused the COVID-19 vaccination; (iii) a reduction in Thompson's sentence is not consistent with applicable United States Sentencing Guideline Manual (U.S. Sent'g Comm'n 2023)("U.S.S.G.") policy statements; and (iv) the 18 U.S.C. § 3553(a) factors do not support Thompson's release, because a time-served sentence is not sufficient to reflect the seriousness of his offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from Thompson, nor to provide Thompson with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  Accordingly, the Court denies the Motion.

## **FACTUAL BACKGROUND**

The Court takes its facts from: (i) the Motion; (ii) the Response to Motion for Motion [sic] to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A), filed January 27, 2021 (Doc. 142)("Response"); (iii) the Presentence Investigative Report, filed February 16, 2022 (Doc. 153-1)("PSR"); (iv) the Notice of Factual and Legal Developments, filed April 12, 2021 (Doc. 145)("First Notice"); (v) the Second Notice of Factual and Legal Developments, filed May 26, 2021 (Doc. 146)("Second Notice"); and (vi) the Notice of Information Regarding Booster Shots, filed February 11, 2022 (Doc. 152)("Third Notice").  The Court first describes Thompson's

previous criminal history.  Second, the Court discusses Thompson's offense of conviction.  Last, the Court outlines Thompson's time in prison, including his medical problems and matters related to the COVID-19 pandemic.

      **1.**      **<u>Thompson's Criminal History</u>.**

1.      Thompson was arrested three times as a juvenile.  <u>See</u> PSR ¶¶ 62-64, at 31.

2.      Thompson has nine prior criminal convictions, <u>see</u> PSR ¶¶ 47-55, at 21-28, five of which involve violence, PSR ¶¶ 47, 49-51, 54, at 20-24, 26.

3.      On March 30, 1998, Thompson was convicted of assault against a household member after he told his ex-girlfriend that he would "kill" her and "shoot" her, and then broke the front window of her home.  PSR ¶ 47, at 21.

4.      On February 5, 2002, Thompson was convicted of battery upon a peace officer after he struck an Albuquerque Police Department ("APD") officer, knocking him backwards, slammed a car door on the officer's leg, and later kicked and struck the officer.  PSR ¶ 49, at 22.

5.      Also on February 5, 2002, Thompson was convicted of attempt to commit aggravated battery against a household member after Thompson committed domestic violence against an ex-girlfriend by restraining her and using force against her with a seat belt, a knife, and a screwdriver.  <u>See</u> PSR ¶ 50, at 24.

6.      On November 21, 2003, Thompson was convicted of attempt to commit first-degree murder and sentenced to nine years' custody after pleading guilty to shooting a man named Tampa Mitchell in Albuquerque, New Mexico.  <u>See</u> PSR ¶ 51, at 25; Response at 12-13.

7.      Also on November 21, 2003, Thompson was convicted of an additional attempted first-degree murder charge -- Thompson shot a woman named Mandy Lavato in the chest -- and

Thompson was sentenced to an additional nine years' custody to serve concurrently with the sentence he received for Mitchell's attempted murder.  See PSR ¶ 54, at 27; Response at 13-14.

8.  In addition to his criminal convictions, Thompson has an extensive arrest record, including arrests for robbery, assault, trafficking a controlled substance, and additional domestic-violence related charges.  See PSR ¶¶ 62-75, at 31-36.

**2.  The Underlying Offense.**

9.  On April 28, 2012, at approximately 2:48 a.m., APD dispatch received calls from several residents of the Warren Apartments in Albuquerque, "in reference to a disturbance and possible fight between females."  PSR ¶ 8, at 6.

10.  Later that morning, at approximately 3:07 a.m., APD dispatch received calls from several residents of the apartments who represented that they heard multiple gunshots, the sound of glass breaking, and screaming.  See PSR ¶ 9, at 6.

11.  APD officers arrived at the scene of a shooting, which was determined to be at Naomi Trujillo's apartment.  See PSR ¶ 9, at 6.

12.  Officers located a female, later identified as Naomi Trujillo, lying in the open doorway to her apartment, suffering from an apparent gunshot wound.  See PSR ¶ 10, at 7.

13.  Trujillo was transported to the University of New Mexico Hospital ("UNMH") where she later died.  See PSR ¶ 10, at 7.

14.  Upon clearing the residence, APD officers located a second female, later identified as May Valerio, lying in a bedroom closet, deceased, and suffering from at least one gunshot wound.  See PSR ¶ 11, at 7.

- 4 -

15.     It was later discovered that a male, Rodney Davis, drove himself to UNMH with a gunshot wound to his torso.  See PSR ¶ 61, at 30.

16.     Davis told APD officers that a fight had taken place between Trujillo and Valerio, and two other females, later identified as Shalaka Booker and Sabrina Garley.  See PSR ¶ 61, at 30.

17.     Davis described that he had been staying at Trujillo's apartment after the altercation between the women, when a black male with a grey hoodie broke the glass window on the apartment's front door and "began shooting into the apartment."  PSR ¶ 61, at 30.

18.     APD officers identified Booker and her boyfriend, Thompson, as suspects in Davis' shooting, and in Trujillo and Valerio's murders.  See PSR ¶ 61, at 30.

19.     APD officers obtained an arrest warrant for Thompson for two counts of murder, in addition to search warrants for Thompson's place of business, DBD Jeweler, Thompson's residence, and Thompson's vehicle.  See PSR ¶ 12, at 7.

20.     On July 12, 2012, APD detectives set up surveillance at DBD Jeweler in an attempt to take Thompson into custody.  See PSR ¶ 13, at 7.

21.     After observing Thompson leaving the business, APD detectives conducted a traffic stop of Thompson and took Thompson into custody.  See PSR ¶ 13, at 7.

22.     APD detectives discovered a loaded Smith & Wesson 9 mm semiautomatic handgun in addition to two cellophane-wrapped bundles of cash in the vehicle.  See PSR ¶¶ 14-15, 22, 29, at 7, 16-17.

23.     Inside a safe in Thompson's place of business, officers discovered twelve firearms, including four semiautomatic rifles, along with more than a thousand rounds of ammunition.  See PSR ¶¶ 18-19, 22, at 10-15.

24.     On November 27, 2012, Thompson was charged with one count of felon in possession of a firearm.  PSR ¶ 1, at 6.

25.     On January 14, 2014, Thompson pled guilty to one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2), and was sentenced, pursuant to a written plea agreement, to fifteen years in custody.  See PSR ¶¶ 2-4, at 6; Judgment in a Criminal Case, filed October 20, 2014 (Doc. 92)("Judgment").

**3.     Thompson's Medical Conditions and Time in Prison.**

26.     Thompson suffers from pulmonary sarcoidosis.  See Motion at 7; Selected  Medical Records for Alfonzo Thompson, filed January 6, 2021 (Doc. 140-3)("Medical Records").

27.     "Sarcoidosis is a disease characterized by the growth of tiny collections of inflammatory cells (granulomas) in any part of your body -- most commonly the lungs and lymph nodes."     Sarcoidosis,     Mayo     Clinic,     http://www.mayoclinic.org/diseases-conditions/sarcoidosis/symptoms-causes/syc-20350358     (last     visited     March     18, 2024)("Sarcoidosis Information").

28.     When sarcoidosis affects the lungs, it is referred to as pulmonary sarcoidosis.  See Sarcoidosis Information.

29.     "Untreated pulmonary sarcoidosis can lead to permanent scarring in your lungs (pulmonary fibrosis), making it difficult to breathe . . . ."  Sarcoidosis Information.

30.     Pulmonary sarcoidosis is an interstitial lung disease.  See Claudio Tana et al.,
Sarcoidosis and COVID-19: At the Cross-Road between Immunopathology and Clinical
Manifestation, Biomedicines, at 3 (October 9, 2022).

31.     The Center for Disease Control ("CDC") lists "interstitial lung disease" as a
medical condition that places an individual at "high risk" for severe illness from COVID-19.
Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19: Information
for Healthcare Professionals, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-
care/underlyingconditions.html (last visited March 18, 2024).  See People with Certain Medical
Conditions, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-
with-medical-conditions.html (last visited March 18, 2024)(stating that "[h]aving damaged or
scarred lung tissue known as interstitial lung disease" "can make you more likely to get very sick
from COVID-19").

32.     When sarcoidosis is in remission, "flare ups" are still possible, but "[t]he longer
you go without symptoms, the less likely you are to have a flare." Living With Sarcoidosis, Nat'l
Heart, Lung, & Blood Inst., https://www.nhlbi.nih.gov/health/sarcoidosis/living-with (last visited
March 18, 2024).

33.     Between 2007 and 2009, Thompson's sarcoidosis was treated with steroids and
antibiotics.  See Motion at 7-8; Bureau of Prisons Health Services Clinical Encounter at 1 (dated
March 29, 2021), filed April 12, 2021 (Doc. 145-1)("March 2021 Clinical Report").

34.     Thompson's sarcoidosis is in remission, see March 2021 Clinical Report at 2, but
has left him with scarring to the lungs, see Motion at 7; Medical Records at 84 (describing 2019
chest x-ray results).

35.     The BOP has provided ongoing care and checkups to monitor Thompson's sarcoidosis.  See Medical Records at 58, 84, 89; First Notice at 1, 3-5.

36.     Thompson also suffers from sleep apnea, see Medical Records at 3, 16, and has experienced seizures in his sleep, the cause of which has yet to be determined, see Medical Records at 1, 3; First Notice at 4 (indicating a "[n]ormal MRI evaluation of the brain" after an MRI was conducted to determine Thompson's seizures' cause).

37.     On March 15, 2021, Thompson tested positive for COVID-19, and experienced no symptoms apart from the loss of his taste and smell.  See First Notice at 1.

38.     On March 29, 2021, a chest x-ray was performed after Thompson reported that he was concerned that his sarcoidosis might be returning, and no notable changes from previous x-rays were observed.  See First Notice at 1-2; March 2021 Clinical Report at 1.

39.     On April 20, 2021, Thompson refused the Moderna COVID-19 vaccine when it was offered to him, despite that Thompson has no known medical contraindication to the vaccine.  See Second Notice at 2; Bureau of Prisons Health Services Immunizations at 1-2 (dated May 24, 2021), filed May 26, 2024 (Doc. 146-1)("Immunization Report").

40.     The BOP classifies Thompson as a "Level-1 inmate," which is "the lowest of BOP's four medical care levels, with Level 4 inmates requiring the most intensive medical care." Response at 19.  See BOP Care Level Classification for Medical and Mental Health Conditions or Disabilities, https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (last visited February 5, 2024).

41.     COVID-19 vaccinations and booster shots are available to inmates at FCI Florence. See Immunization Report at 1; Third Notice at 1.

42.     During the six months preceding the Motion's filing, Thompson had no disciplinary incidents.  See Individualized Needs Plan at 1, filed January 6, 2021 (Doc. 140-2)("Needs Plan").

43.     While incarcerated, Thompson has taken over twenty educational courses and completed drug education.  See Needs Plan at 1-2.

## **PROCEDURAL HISTORY**

Thompson filed his Motion on January 6, 2021.  See Motion at 1.  The United States filed its Response on January 27, 2021.  See Response at 1.  The United States filed notices of factual and legal developments on April 12, 2021, see First Notice at 1, and May 26, 2021, see Second Notice at 1.  The Court held a hearing on January 31, 2022.  The United States filed a third notice of factual and legal developments on February 11, 2022.  See Third Notice at 1.

**1.      The Motion.**

In the Motion, Thompson argues that "his medical infirmities and his particular vulnerability to severe infection and/or death due to COVID-19," constitute extraordinary and compelling reasons warranting his release.  Motion at 1.  Specifically, Thompson identifies his sarcoidosis as "diminish[ing] his ability to provide self-care within the prison" and placing him at high risk of a severe COVID-19 infection.  Motion at 6-10.  In addition, Thompson contends that his "ongoing seizures" place him at high risk of "complications in the event he is infected with the virus."  Motion at 11.  Finally, Thompson argues that the relevant 18 U.S.C. § 3553(a) factors favor his release, because he has "suffered from anxiety and post-traumatic stress disorder, likely due at least in part to the turbulence in his early life," has "maintained clear conduct" during his incarceration while taking advantage of "educational and rehabilitative opportunities," and has "served more than two thirds of his 180 month sentence."  Motion at 12-13.

- 9 -

2.      **The Response**.

The United States responds that "the relevant factors under 18 U.S.C. § 3553(a) command the conclusion that Thompson must remain in BOP custody until his sentence is complete," Response at 1, even if the Court were to conclude that extraordinary and compelling reasons warrant Thompson's release, see Response at 9.  The United States contends that the need to protect the public through incapacitation and the potential for incarceration to provide specific deterrence are § 3553(a) factors that weigh heavily against Thompson's release.  See Response at 2.  The United States describes in detail Thompson's lengthy criminal history, which it argues provides further evidence that Thompson must serve out his remaining sentence.  See Response at 9-16 ("Affording due consideration to Thompson's long, violent criminal history requires him to serve his full sentence.").

Next, the United States argues that, pursuant to U.S.S.G. § 1B1.13, the Court may not reduce Thompson's sentence if the Court determines that Thompson is "'a danger to the safety of any other person or to the community.'"  Response at 17 (quoting U.S.S.G. § 1B1.13).  The United States avers that Thompson's "early release would pose an unacceptable danger to the community."  Response at 17.  Moreover, the United States contends that Thompson's medical conditions are not an extraordinary and compelling reason for a sentence reduction, because Thompson has not demonstrated that his conditions are "so unusually severe" that they merit his release, Response at 18, particularly where the BOP has classified Thompson at the "lowest of BOP's four medical care levels," Response at 19.  Specifically, the United States argues that Thompson has not established that his sarcoidosis, his treated sleep apnea, or his unconfirmed seizures constitute "a severe COVID risk factor."  Response at 19-22.  Finally, the United States

provides that inmate vaccination, which is currently underway, is an additional factor weighing against Thompson's release.  Response at 22-23.

3.     **The United States' First and Second Notices of Factual and Legal Developments.**

Following its Response, the United States filed two notices of factual and legal developments.  In the First Notice, the United States notifies the Court that Thompson tested positive for COVID-19 on March 15, 2021, and experienced a mild COVID-19 case.  First Notice at 1.  The United States provides that, following his COVID-19 diagnosis, Thompson underwent a new chest x-ray that discovered no changes to the scarring on Thompson's lungs, and that an MRI conducted to evaluate Thompson's seizures "was normal."  First Notice at 1-2.  Finally, the United States asserts that the BOP "has made substantial progress in vaccinating staff and Inmates."  First Notice at 2.

In the Second Notice, the United States acknowledges that a recent change to the CDC's guidance on COVID-19 indicates that sarcoidosis is now a "risk factor" for a severe COVID-19 case.  Second Notice at 1-2.  Nevertheless, because Thompson declined the COVID-19 vaccine when it was offered to him, the United States argues, his medical issues do not present any extraordinary and compelling reasons meriting his release.  See Second Notice at 2, 4-9.  Courts largely have held, the United States contends, that an inmate's refusal to take the COVID-19 vaccination weighs against a finding that the inmate's release is warranted.  See Second Notice at 4-9.

4.     **The Hearing.**

At the hearing, Thompson argued that, as a forty-six-year-old man with significant comorbidities, the difficulty in taking care of himself while incarcerated coupled with COVID-

19's particular danger to him, warrants his release. <u>See</u> Draft Transcript of January 31, 2022, Hearing at 4:2-8 (taken January 31, 2022)("Tr.")(Fox-Young).[2]   Thompson clarified that there was no dispute that he had exhausted his administrative remedies. <u>See</u> Tr. at 4:8-10 (Fox-Young). Thompson argued that the United States does not dispute that Thompson's sarcoidosis, specifically, presents an extraordinary and compelling circumstance, but that the United States argues that Thompson is ineligible for release, because he refused the COVID-19 vaccination. <u>See</u> Tr. at 3:7-14 (Fox-Young).  Despite that Thompson does not deny that he refused the vaccination, he argues that he is "legitimately fearful and skeptical about the [vaccine's] potential complications," and highlights that the vaccine is not entirely effective at preventing illness from COVID-19 nor "prevent[ing] severe outcomes for a lot of people, particularly people who have underlying conditions."  Tr. at 4:15-6:2 (Fox-Young).  It is somewhat contradictory, Thompson identifies, that the United States argues that he is ineligible for release on the basis of his declining the COVID-19 vaccine, where, in other cases, the United States has argued that an inmate's receipt of the vaccine is also a factor weighing against their release, because they are better protected from the virus.  Tr. at 6:2-15 (Fox-Young)("[I]t just cannot be that regardless of your vaccination status you're no longer eligible for release simply by virtue of the fact that vaccines are available and out there.").  Regarding the 18 U.S.C. § 3553(a) factors, Thompson provides that his clear record during his incarceration and the fact that he has "availed himself of . . . more than 20 courses at the BOP including work towards his GED [and] completing drug education and non[-]residential

---

[2]The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

drug treatment" compel his release.  Tr. at 7:9-17 (Fox-Young).  Thompson concluded that he has more than served the time to which he was sentenced, because of the difficult nature of serving time during the COVID-19 pandemic.  See Tr. at 8:4-19 (Fox-Young).

The United States responded that it is requesting that the Court deny the Motion on two independent grounds.  See Tr. at 9:14-18 (Messec).  First, the United States posited that "Thompson has not presented extraordinary or compelling [] reasons for his release," because health issues and the "danger of contracting COVID" are insufficient where Thompson has declined the vaccine.  Tr. at 9:19-10:1 (Messec).  Despite that new variants have made COVID-19 infections more likely even in those who have been vaccinated, the United States argued, nothing has changed regarding the fact that vaccination continues to help "prevent severe consequences [] from a COVID-19 infection."  Tr. at 10:1-17 (Messec).  Second, the United States "contends that the 3553(a) factors do not weigh in favor of Mr. Thompson's release," because Thompson still has a quarter of his sentence left and the seriousness of his criminal record and charged conduct compels his continued incarceration to "promot[e] respect for the law" and achieve the goals of "general and specific deterrence."  Tr. at 10:18-11:13 (Messec).

Thompson replied briefly that he did not believe the record indicating that he had contracted COVID-19 was "reliable" enough for the Court to consider and represented that the BOP was not providing COVID-19 booster shots at its facilities.  Tr. at 11:17-12:22 (Fox-Young).  The Court agreed that Thompson has "some serious health problems," but expressed that "the vaccine would reduce consider[]ably his risk [of] hospitalization and death" from COVID-19.  Tr. at 13:2-10 (Court).  The Court indicated that it is not clear whether Thompson would have better health outcomes outside prison than while incarcerated, particularly where the risk of contracting

- 13 -

COVID-19 in public remains.  See Tr. at 13:12-16 (Court)("He might be better off in prison with the health care that he gets and the attention that he gets . . . .").  The Court concluded that it was inclined to deny the Motion, because the Court did not believe that Thompson's case presented extraordinary and compelling circumstances and agreed with the United States that the 18 U.S.C. § 3553(a) factors weighed against Thompson's release.  Tr. at 13:22-14:9 (Court)("I think to protect the public he need to finish out his term.").

     5.    **The United States' Third Notice of Factual and Legal Developments**.

The United States submitted the Third Notice shortly after the hearing on February 11, 2022.  See Third Notice at 1.  In the Third Notice, the United States disputes Thompson's contention at the hearing that booster shots are not widely available within the BOP.  See Third Notice at 1.  The United States provides that "the United States has consulted with BOP health officials responsible for facilities in Thompson's region and has confirmed that booster shots are being offered to inmates," and calls the Court's attention to a study highlighting the effectiveness of COVID-19 booster shots.  Third Notice at 1-2.

## LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  See United States v. Booker, 543 U.S. at 261.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."

United States v. Booker, 543 U.S. at 261.  Accordingly, even though the sentencing guidelines are not mandatory, courts must consult them for advice in arriving at an appropriate sentence.  See Peugh v. United States, 569 U.S. 530, 541-42 (2013).  The sentencing guidelines should provide a starting point for the court's determination of a proper sentence.  See Gall v. United States, 552 U.S. 38, 50 n.6 (2007)("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."); Peugh v. United States, 569 U.S. at 541 ("The post-Booker federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review.").

Congress has directed sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> **(A)**     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> **(B)**     to afford adequate deterrence to criminal conduct;
>
> **(C)**     to protect the public from further crimes of the defendant; and
>
> **(D)**     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to further

- 15 -

consider: (i) "the nature and circumstances of the offense," as well as the defendant's "history and characteristics"; (ii) the available sentences; (iii) the Guidelines; (iv) any pertinent Sentencing Commission policy statements in effect on the date of sentencing; (v) the policy favoring uniformity in sentences for defendants who commit similar crimes; and (vi) the need to provide restitution to victims.  18 U.S.C. § 3553(a)(1), (3)-(7).

The United States Court of Appeals for the Tenth Circuit holds that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration. See United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . ." United States v. Cage, 451 F.3d at 593.  A court's careful consideration of the Guidelines is proper in light of the fact that "[t]he Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." Rita v. United States, 551 U.S. 338, 349 (2007).

"[A] sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351. Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption

in favor of the advisory[3] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v.

---

[3]Attorneys and courts often say that the Guidelines are advisory, but it is more accurate to say that the resulting Guidelines ranges are advisory.  See Gall v. United States, 552 U.S. 38, 46 (2007)("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated to apply, however, a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

      The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).
. . . .

      The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States, 552 U.S. 85 (2007), that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. at 101 (alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553

United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479, 2008 WL 2229550, at *6 (D.N.M. February

13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are

"in a superior position to find facts and judge their import under § 3553(a) in each particular case."

Kimbrough v. United States, 552 U.S. at 89. A reasonable sentence is one that also "avoid[s]

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct." 18 U.S.C. § 3553(a). See United States v. Booker, 543 U.S. at 261-

62.

## LAW REGARDING COMPASSIONATE RELEASE

Federal courts are generally forbidden from modifying a term of imprisonment after it has

been imposed. See Freeman v. United States, 564 U.S. 522, 526 (2011). Nevertheless, this "rule

of finality is subject to a few narrow exceptions," including when a defendant moves for a sentence

---

U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

reduction under 18 U.S.C. § 3582(c)(1)(A).  United States v. Maumau, 993 F.3d 821, 830 (10th

Cir. 2021)("Maumau").  Section 3582(c)(1)(A), commonly known as the compassionate release

statute, allows a defendant to move the court for early release from prison provided certain

conditions are met.[4]  First, § 3582(c)(1)(A) "requires exhaustion before a court may consider a

motion for compassionate release."  United States v. Hemmelgarn, 15 F.4th 1027, 1030 (10th Cir.

2021).  A defendant satisfies this exhaustion requirement if: (i) "the defendant has fully exhausted

all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

defendant's behalf"; or (ii) thirty days have lapsed "from the receipt of such a request by the

warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).[5]

---

[4]Before the passage of the First Step Act of 2018, Pub. L. No. 115-39132 Stat 5194 (December 21, 2018)("First Step Act"), 18 U.S.C. § 3582 permitted only the BOP Director to ask the court for a defendant's compassionate release.  See, e.g., United States v. Smartt, 129 F.3d 539, 541 (10th Cir. 1997)(explaining that a prisoner was not eligible for compassionate release absent motion from BOP Director).  The First Step Act, however, amended § 3582 to enable defendants to petition the court for compassionate release after exhausting administrative remedies.  See United States v. Maumau, 993 F.3d 821, 830 (10th Cir. 2021)("Maumau")(discussing the First Step Act's changes to § 3582).

[5]In the United States Court of Appeals for the Tenth Circuit, this exhaustion requirement is a mandatory claim-processing rule, meaning the requirement is not "jurisdictional," and "challenges based on the failure to exhaust 'can be waived or forfeited.'"  United States v. Hemmelgarn, 15 F.4th 1027, 1030-31 (10th Cir. 2021)("[M]andatory claim-processing rules do not implicate the courts' adjudicatory authority . . . .").  See United States v. Nash, No. 19-40022, 2022 WL 2072733, at *1 (D. Kan. June 9, 2022)(Crabtree, J.)("[T]his exhaustion requirement is a claim-processing rule that the government may waive or forfeit.").  For example, in United States v. Hemmelgarn, the Tenth Circuit considered the defendant's motion for compassionate release, even though the defendant "failed to provide proof that he exhausted his administrative remedies," because "the government did not argue exhaustion on appeal."  15 F.4th at 1031.  Before United States v. Hemmelgarn, the Tenth Circuit suggested that the exhaustion requirement is jurisdictional and, therefore, not subject to waiver.  See, e.g., United States v. Johnson, 849 F. App'x 750, 753 (10th Cir. 2021)("In this circuit, however, § 3582(c)(1)(A)'s exhaustion requirement is mandatory, rather than judicially waivable.");  United States v. Gonzales, 547 F. Supp. 3d 1083, 1109 (D.N.M. 2021)(Browning J.)("[T]he Tenth Circuit has continued to impose the exhaustion requirement as mandatory and not judicially waivable despite the COVID-19 pandemic."), aff'd, No. 21-2060,

If a defendant satisfies the exhaustion requirement, district courts follow a three-part test to evaluate a defendant's compassionate release motion.  See United States v. McGee, 992 F.3d 1035, 1042-43 (10th Cir. 2021)("McGee")(citing United States v. Jones, 980 F.3d 1098, 1107 (6th Cir. 2020)); United States v. Haworth, No. CR 95-0491, 2023 WL 8112827, at *10-16 (D.N.M. November 22, 2023)(Browning, J.)(assessing a compassionate release motion under McGee's three-part test).  First, the court must determine whether extraordinary and compelling reasons warrant a sentence reduction.  See McGee, 992 F.3d at 1042; 18 U.S.C. § 3582(c)(1)(A)(i).  Second, the court must find whether such a reduction is consistent with applicable policy statements that the Sentencing Commission has issued.  See McGee, 992 F.3d at 1042.  Third, the court must consider whether a reduction aligns with the applicable 18 U.S.C. § 3553(a) factors.  See McGee, 992 F.3d at 1042.  Defendants must satisfy all three requirements, and, accordingly, district courts may deny a compassionate release motion on any of the three steps without addressing the others.  See United States v. Hald, 8 F.4th 932, 942-43 (10th Cir. 2021)("If the most convenient way for the district court to dispose of a motion for compassionate release is to reject it for failure to satisfy one of the steps, we see no benefit in requiring it to make the useless gesture of determining whether one of the other steps is satisfied."), cert. denied, 142 S. Ct. 2742 (2022); McGee, 992 F.3d at 1042.  Conversely, courts must address all three steps when granting a motion for compassionate release.  See Maumau, 993 F.3d at 831 n.4.

1.    **Extraordinary and Compelling Reasons.**

At the first step of the three-part compassionate release test, courts must determine whether

2021 WL 5985347 (10th Cir. Dec. 17, 2021); United States v. Heath, No. CR-13-102, 2020 WL 1957916, at *2 (W.D. Okla. April 23, 2020)(Palk, J.)(collecting cases).

"extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). See McGee, 992 F.3d at 1042. District courts "have the authority to determine for themselves what constitutes extraordinary and compelling reasons." United States v. Hald, 8 F.4th at 938 n.4. See McGee, 992 F.3d at 1044 ("Congress intended to afford district courts with discretion, in carrying out the first step of the statutory test in § 3582(c)(1)(A)(i), to independently determine the existence of extraordinary and compelling reasons . . . ."). This discretion, however, "is bounded by the requirement under step two of the statutory test that a reduction in sentence be consistent with applicable policy statements issued by the Sentencing Commission." Maumau, 993 F.3d at 832. The Court has "deriv[ed] its test for extraordinary and compelling circumstances from the words' dictionary definitions." United States v. Gonzales, 547 F. Supp. 3d 1083, 1124-25 (D.N.M. 2021)(Browning, J.), aff'd, No. 21-2060, 2021 WL 5985347 (10th Cir. December 17, 2021). Black's Law Dictionary defines extraordinary as "[b]eyond what is usual, customary, regular, or common," Extraordinary, Black's Law Dictionary (11th ed. 2019), and the New Oxford American Dictionary defines compelling as "evoking interest, attention, or admiration in a powerfully irresistible way; not able to be refuted, inspiring conviction; not able to be resisted, overwhelming," Compelling, New Oxford American Dictionary (3d ed. 2010). See United States v. Haworth, 2023 WL 8112827, at *11 ("Haworth has not demonstrated that the risks posed by COVID-19 extend '[b]eyond what is usual, customary, regular, or common . . . .'" (quoting Extraordinary, Black's Law Dictionary (11th ed. 2019)). Accord United States v. Castano-Vasquez, 266 F.3d 228, 233 (3d Cir. 2001).

Courts commonly consider whether a defendant's medical condition constitutes extraordinary and compelling reasons. In determining whether medical issues warrant a

defendant's release, courts evaluate: (i) the severity of the defendant's medical conditions, including whether a condition is terminal, see United States v. Bauer, 554 F. Supp. 3d 1109, 1112-13 (D.N.M. 2021)(Johnson, C.J.)(concluding that the defendant's numerous, serious, and irreparable debilitations demonstrated extraordinary and compelling reasons to reduce his sentence, even though the defendant had an extensive criminal history); United States v. Lopez, 487 F. Supp. 3d 1156, 1158 (D.N.M. 2020)(Vázquez, J.)(recognizing that "where the defendant is suffering from a terminal illness," compassionate release may be warranted); but see United States v. Chambliss, 948 F.3d 691, 693-94 (5th Cir. 2020)(denying a request for compassionate release where the defendant had a terminal disease, because the defendant had committed a serious drug crime and previously had committed aggravated robbery); (ii) the defendant's age, because older inmates are more likely to have serious diseases, are more likely to have served a significant portion of his or her sentence, and are less likely to be a danger to society if released, see United States v. Johns, No. CR 91-392, 2019 WL 2646663, at *3 (D. Ariz. June 27, 2019)(Jorgenson, J.)(granting release to an 81-year-old defendant who served almost twenty-three years of his sentence, could no longer go to the cafeteria to eat, had a fading memory, and was the oldest inmate at the facility); but see United States v. Slater, 547 F. Supp. 3d 58, 87 (D. Me. 2021)(Woodcock, J.)(denying compassionate release despite that the defendant was elderly and suffered from numerous health conditions, because the defendant was not entirely incapacitated and could still cause serious harm with a gun); and (iii) whether the defendant is receiving adequate care while incarcerated, see United States v. Beck, 425 F. Supp. 3d 573, 581 (M.D. N.C. 2019)(Eagles, J.)(granting a motion for compassionate release in part because of the "abysmal health care" provided by the BOP); United States v. Eccleston, 543 F. Supp. 3d 1092, 1140 (D.N.M.

2021)(Browning, J.)("S. Eccleston's medical difficulties do not present extraordinary and compelling circumstances, because the record indicates that the BOP manages effectively his chronic conditions . . . .").[6]

---

[6]Generally speaking, it is very difficult for the Court to decide: (i) whether the BOP's medical care has been poor; and (ii) whether that poor care has compromised the defendant's prospects of survival in a compassionate release case.  Normally, poor medical care in prison is addressed in civil cases and not in criminal cases.  See Ramos v. Martinez, No. CIV 17-0120, 2019 WL 7049620, at *3 (D.N.M. Dec. 23, 2019)(Browning, J.)("Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain that the Eighth Amendment proscribes.").  Typically, the courts do not deal with medical care in the criminal context, but wait for a Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens") action under the Eighth Amendment.  See, e.g., Carlson v. Greene, 446 U.S. 14, 20 (1980); Estelle v. Gamble, 429 U.S. 97, 104 (1976); Richardson v. Daniels, 557 F. App'x 725, 728 (10th Cir. 2014)(affirming dismissal of a prisoner's Bivens claim which alleged that the defendants "violated his Eighth Amendment rights in connection with their response to a seizure he had," where "corrections officers responded to his seizure, he received prompt medical attention and has been given medicine to treat seizures").  Cf. Moya v. San Juan Cnty. Adult Det. Ctr., No. CIV 20-0431, 2022 WL 16924001, at *3-5 (D.N.M. November 14, 2022)(Browning, J.)(recognizing that § 1983 is the proper avenue for pre-trial detainees to vindicate their medical claims).

The efficient solution to poor medical care in a prison setting is neither to redo a sentence nor to release the defendant.  It seems strange that federal courts do not deal with medical protection in criminal cases unless detention center circumstances jeopardize the defendant's right to effective assistance of counsel, see United States v. Boigegrain, 155 F.3d 1181, 1186 (10th Cir. 1998)("[I]t was impossible for the district court to allow the defendant to waive counsel before determining whether he was competent to stand trial."), but, once a defendant goes to prison, courts may use poor medical care to release a defendant, see, e.g., United States v. Beck, 425 F. Supp. 3d 573, 586 (M.D.N.C. 2019)(Eagles, J.)(granting a prisoner's compassionate release motion "given her breast cancer and the poor treatment she has received at BOP").  Instead, Bivens actions are a more suitable remedy to problems with prison medical care rather than compassionate release motions.  Unless the parties are willing to present the court with a robust evidentiary record, the court is left with the uneasy feeling that it is dealing with a pro se prisoner's complaint that is often seen in Bivens actions -- skeptical that the situation is as bad as the pro se prisoner says it is.

Moreover, it is difficult for a district court to compare medical care.  Often, a defendant, when released, has no medical insurance, and his or her care is problematic.  It is not clear how the court should compare the care in a medical BOP Facility with care on the outside, particularly where the court must speculate regarding the quality of medical a defendant might receive once released.  Further, it is very difficult for a district court to know, without the discovery and experts it has in a civil case, whether the defendant is the problem or whether the facility is the problem.  See Nicholson v. Evangelical Lutheran Good Samaritan Soc'y, Inc., No. CIV 16-0164, 2017 WL

Since the emergence of COVID-19, the Court has considered whether the risks the virus poses constitute extraordinary and compelling reasons.  First, general concerns about potential exposure to COVID-19 alone do not demonstrate an extraordinary and compelling reason for a reduced sentence.  See United States v. Wood, No. CR 14-2446, 2020 WL 4016058, at *2 (D.N.M. July 16, 2020)(Browning, J.)("'[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release.'" (quoting United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020))).  Rather, a defendant must demonstrate that his or her medical conditions make acquiring COVID-19 more likely or increase the risk that the defendant will experience a severe case of COVID-19 upon contraction of the virus.  See United States v. Hemmelgarn, 15 F.4th at 1031 ("The district court's finding that these medical conditions identified by Hemmelgarn do not place him at a risk of severe illness from COVID-19 is not clearly erroneous."); United States v. Baca, No. CR 16-1613, 2020 WL 5369078, at *15 (D.N.M. September 8, 2020)(Browning, J.)("[C]ases in which COVID-19 is a

---

3127799, at *29 (D.N.M. July 21, 2017)(Browning, J.)(stating that, in a medical malpractice case, the plaintiff must "use expert medical testimony," because, where "'the cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion,' a plaintiff must introduce expert medical testimony that establishes causation")(quoting Woods v. Brumlop, 1962-NMSC-133, ¶ 15, 71 N.M. 221, 225, 377 P.2d 520, 523, and citing O'Banion v. Owens Corning Fiberglass Corp., 968 F.2d 1011, 1013 (10th Cir. 1992)(affirming an order that excluded evidence of cancer where plaintiff presented no evidence "from a qualified medical expert stating that there is a reasonable medical probability the Plaintiff will have a cancer condition from his asbestos related disease")).

Accordingly, courts should proceed with caution when they encounter the thin medical record that often exists in criminal cases.  Moreover, presenting courts with voluminous medical records is not very helpful where the litigation lacks expert testimony and a true adversarial process, as is often the case in compassionate release motions.  On this basis, the court cannot evaluate meaningfully whether the defendant has properly requested medical assistance, whether the facility has improperly denied the requested care, and how severe the defendant's health condition is.  See United States v. Gonzales, 547 F. Supp. 3d at 1118.

factor for compassionate release require more than speculative complications.").

In determining whether the risk of severe COVID-19 from a medical condition constitutes an extraordinary and compelling reason, the United States has, in some cases, "concede[d] that having a CDC-identified COVID-19 risk factor satisfies the extraordinary and compelling prong of § 3582(c)(1)(A)(i)." United States v. Loughry, No. CR 08-0132, 2020 WL 7319077, at *3 (S.D. Ind. Dec. 10, 2020)(Barker, J.)(listing cases). See United States v. Gonzales, 547 F. Supp. 3d at 1100 ("The United States . . . admits that Gonzales' case satisfies the extraordinary and compelling circumstances requirement, [because] Gonzales' asthma and severe obesity 'are clearly identified as risk factors by the CDC.'" (quoting the record)). The Court has concluded, however, that the defendant's suffering from a medical condition that the CDC has identified as a COVID-19 risk factor (a "listed condition") does not compel the conclusion that the defendant has demonstrated extraordinary and compelling circumstances. See United States v. Gonzales, 547 F. Supp. 3d at 1100 (disagreeing with the United States' "blanket concession" that, "where an individual is incarcerated and has a condition that the CDC asserts creates a heightened risk of COVID-19 complications . . . , that person presents extraordinary and compelling circumstances," and concluding that "the Court must[] evaluate each case on an individualized basis"). The Tenth Circuit agrees that, while district courts may rely on CDC guidance in determining whether extraordinary and compelling reasons exist, they are not bound to conclude that such conditions exist by the mere fact that an inmate's medical condition is a listed condition:

> Mr. Mendoza-Contreras appears to contend that district courts lack discretion to deny compassionate release to any inmate who has an underlying medical condition that increases his risk of severe illness from COVID-19. We reject that proposition as inconsistent with the district court's broad discretion to determine what constitutes extraordinary and compelling reasons under § 3582(c)(1)(A)(i).

United States v. Mendoza-Contreras, No. 22-5057, 2023 WL 2706808, at *3 (10th Cir. March 30, 2023).   In addition, "access to vaccination . . . weigh[s] against a finding of extraordinary and compelling reasons," United States v. Hald, 8 F.4th 932 at 939 n.5; see United States v. Jefferson, No. 22-8067, 2023 WL 5572550,  at *2 (10th Cir. August 29, 2023)(collecting cases), and numerous courts have held "that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances," United States v. Baeza-Vargas, 2021 WL 1250349, at *2-3 (D. Ariz. April 5, 2021)(Teilborg, J.).

In addition to a defendant's medical concern, courts have cited a change in sentencing, such that the defendant would be given a significantly lower sentence now compared to the original sentence as an extraordinary and compelling circumstance.   See Maumau, 993 F.3d at 837 (agreeing with the district court that the length of the defendant's sentence, and the fact that the defendant would not receive the same sentence if the crime occurred today, supported a finding of extraordinary and compelling reasons); United States v. Eccleston, 543 F. Supp. 3d at 1144-45 (identifying the defendant's "reasonable, but incorrect, belief when he signed his State and federal Plea Agreements that his state and federal sentences would run concurrently" as one factor among many that "persuades the Court to find extraordinary and compelling circumstances").   Courts nevertheless must be cautious when considering circumstances surrounding a defendant's sentence as part of the extraordinary and compelling analysis to accord due respect to Congress' province to fix criminal penalties:

> The length of the sentence cannot be an extraordinary and compelling reason to grant compassionate release because this would infringe on the legislature's province to fix penalties.   This is especially true when mandatory minimums are involved.   In essence, Andrews asks the Court to reevaluate his sentence and fashion its own brand of justice.   But to do so in this manner would intrude on legislative prerogatives.

United States v. Andrews, 480 F. Supp. 3d 669, 678-79 (E.D. Pa. 2020)(Robreno, J.), aff'd, 12 F.4th 255 (3d Cir. 2021).  The Court has concluded, for example, that "prospective statutory changes generally do not result in extraordinary and compelling circumstances warranting compassionate release." United States v. Eccleston, 543 F. Supp. 3d at 1141-42 (citing Van Skiver v. United States, 952 F.2d 1241, 1245 (10th Cir. 1991)).  Furthermore, some courts have held that care needs for the defendant's family members also may support the defendant's request for compassionate release.  See United States v. Washburn, No. 10-2456, 2023 WL 3853343, at *4 (D.N.M. June 6, 2023)(Urias, J.)("Defendant has established that the circumstances involving his mother's caregiving contributes to a finding of extraordinary and compelling reasons that warrant his compassionate release because he is the only available caregiver for her."); Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28257 (May 3, 2023)("[A] parent has been the family member most often identified as needing care by courts granting sentence reductions."). But see United States v. Haworth, 2023 WL 8112827, at *10 ("Haworth has not demonstrated that his mother's medical condition is sufficiently serious to warrant his release to assist in her care."). Finally, Congress has expressed that "'[r]ehabilitation of the defendant alone . . . shall not be considered an extraordinary and compelling reason.'"  McGee, 992 F.3d at 1044 (quoting 28 U.S.C. § 994(t)).

    **2.**    **The U.S.S.G. § 1B1.13 Policy Statement and the 2023 Amendments.**

At the second step of the three-part test for considering motions for compassionate release, courts consider whether a "reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  See McGee, 992 F.3d at 1042.  Congress has directed the Sentencing Commission to promulgate "general policy statements" regarding the

appropriate use of the sentence modification provisions set forth in § 3582(c).  28 U.S.C. § 994(a)(2)(C).  Congress has called upon the Sentencing Commission, in promulgating these general policy statements, to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t).  Applicable policy statements do not define "exclusively" what courts may consider extraordinary and compelling reasons for a sentence reduction; rather, policy statements "describe those characteristic or significant qualities or features that typically constitute 'extraordinary and compelling reasons.'"  McGee, 992 F.3d at 1045 (quoting § 3582(c)(1)(A)).  In short, "Congress intended for the Sentencing Commission's policy statements to serve as guideposts for district courts under the second part of the statutory test."  McGee, 992 F.3d at 1048.

On November 1, 2023, the Sentencing Commission issued an applicable policy statement for motions for compassionate release filed by defendants by amending § 1B1.13.  See U.S.S.G. §1B1.13, Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement).  Before the promulgation of the updated § 1B1.13 policy statement, the Tenth Circuit had held that there were no current applicable policy statements from the Sentencing Commission, because the then existing policy statement was "applicable only to motions filed by the Director of the BOP, and not to motions filed directly by defendants."  Maumau, 993 F.3d at 837.  At the time, § 1B1.13 referred only to motions filed by the BOP director, because § 1B1.13 was issued shortly before the passage of the First Step Act of 2018, Pub. L. No. 115-39132 Stat 5194 (December 21, 2018)("First Step Act"), which, for the first time, provided defendants with the ability to bring motions for compassionate release.  See U.S.S.G. § 1B1.13(a) (2018)(amended 2023).  The Tenth Circuit reasoned that, because § 1B1.13 did not recognize that defendants could

bring compassionate release motions, the policy statement was not applicable to motions brought by defendants.  See McGee, 992 F.3d at 1050 ("[T]he Sentencing Commission's most recent policy statement, which was issued prior to the First Step Act, is not applicable."); United States v. Carr, 851 F. App'x 848, 853 (10th Cir. 2021)(reversing a district court where the district court relied on the policy statement, because, "[a]lthough it was within the district court's discretion to conclude the application notes to U.S.S.G. § 1B1.13 still provided the best definition and description of extraordinary and compelling reasons under the circumstances," it was "not apparent the district court recognized U.S.S.G. § 1B1.13 was no longer controlling"); but see United States v. Bryant, 996 F.3d 1243, 1247 (11th Cir. May 7, 2021)("The Commission's standards are still capable of being applied and relevant to all Section 3582(c)(1)(A) motions, whether filed by the BOP or a defendant. . . .  1B1.13 is still an applicable policy statement for a Section 3582(c)(1)(A) motion, no matter who files it.").

The 2023 amendments expressly "revise[] § 1B1.13(a) to reflect that a defendant is now authorized to file a motion under 18 U.S.C. § 3582(c)(1)(A), making the policy statement applicable to both defendant-filed and BOP-filed motions."  88 Fed. Reg. 28256-57.  Compare U.S.S.G. § 1B1.13(a) (2018) (amended 2023) ("Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ."), with U.S.S.G. § 1B1.13(a) (2023) ("Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . .").  Under § 1B1.13, courts still may decide on their own what constitutes extraordinary and compelling reasons, but, where a court recognizes a circumstance that is not identified specifically in the policy statement, the circumstance must be comparably serious to the

identified reasons to be "consistent" with the policy statement.  18 U.S.C. § 3582(c)(1)(A).  See U.S.S.G. § 1B1.13(b)(5) (clarifying that courts may conclude that "extraordinary and compelling reasons exist" where "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the [explicitly identified extraordinary and compelling] reasons . . . are similar in gravity to the [explicitly identified extraordinary and compelling reasons").  In addition, the 2023 amendment expands the list of "extraordinary and compelling reasons" in § 1B1.13's application notes in numerous ways. For example, the amendment: (i) revises the "Medical Circumstances of the Defendant" subsection to include "medical circumstances not expressly identified in §1B1.13 that were most often cited by courts in granting sentence reduction motions during the pandemic"; (ii) adds a new provision for cases in which a defendant's parent is incapacitated to the "Family Circumstances" subsection; (iii) and creates new subsections for "unusually long sentences" and for defendants who have been victims of "sexual assault perpetrated by BOP personnel."  88 Fed. Reg. 28257.

The current U.S.S.G. § 1B1.13 reads, in full:

> **(a)** **In General**. -- Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that --

> **(1)(A)** Extraordinary and compelling reasons warrant the reduction; or

> **(B)** The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

**(2)** The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

**(3)** The reduction is consistent with this policy statement.

**(b)** **Extraordinary and Compelling Reasons.** -- Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

**(1)** **Medical Circumstances of the Defendant.** --

**(A)** The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

**(B)** The defendant is --

**(i)** suffering from a serious physical or medical condition,

**(ii)** suffering from a serious functional or cognitive impairment, or

**(iii)** experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

**(C)** The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided

- 31 -

and without which the defendant is at risk of serious deterioration in health or death.

**(D)**     The defendant presents the following circumstances --

**(i)**     the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

**(ii)**     due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

**(iii)**     such risk cannot be adequately mitigated in a timely manner.

**(2)**     **Age of the Defendant.** -- The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

**(3)**     **Family Circumstances of the Defendant.** --

**(A)**     The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

**(B)** The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

**(C)** The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

**(D)** The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

**(4)** **Victim of Abuse.** -- The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:

**(A)** sexual abuse involving a "sexual act," as defined in 18 U.S.C. 2246(2) (including the conduct described in 18 U.S.C. 2246(2)(D) regardless of the age of the victim); or

**(B)** physical abuse resulting in "serious bodily injury," as defined in the Commentary to § 1B1.1 (Application Instructions);

that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant.

For purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

- 33 -

**(5)** **Other Reasons.** -- The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

**(6)** **Unusually Long Sentence.** -- If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

**(c)** **Limitation on Changes in Law.** -- Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement. However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction.

**(d)** **Rehabilitation of the Defendant.** -- Pursuant to 28 U.S.C. 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement. However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted.

**(e)** **Foreseeability of Extraordinary and Compelling Reasons.** -- For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

U.S.S.G. § 1B1.13.

- 34 -

3.      **The 18 U.S.C. § 3553(a) Factors**.

At the third step of the three-part compassionate release test, courts must consider "the factors set forth in section 3553(a) to the extent that they are applicable," 18 U.S.C. § 3582(c)(1)(A), and "'determine whether . . . the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case,'" see McGee, 992 F.3d at 1042 (quoting United States v. Jones, 980 F.3d at 1107)(brackets in McGee).  "Section[] 3553(a) describes the factors courts should consider when sentencing defendants."  United States v. Eccleston, 543 F. Supp. 3d at 1147.  Specifically, Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

  (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  (B)    to afford adequate deterrence to criminal conduct;

  (C)    to protect the public from further crimes of the defendant; and

  (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C.   § 3553(a)(2)(A)-(D).   See   18 U.S.C.   § 3551   ("[A]   defendant . . . shall   be sentenced . . . so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) . . . .").  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines;[7] (ii) the nature of the offense and of the defendant's character; (iii) the available

---

[7]Although the Guidelines are no longer mandatory, see United States v. Booker, 543 U.S. 220, 261 (2005), both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration, see Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens

sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.   See 18 U.S.C. § 3553(a)(1), (3)-(7).   "[T]he Supreme Court has determined that courts may consider post-sentencing conduct in assessing the § 3553(a) factors when considering whether to adjust a previously imposed sentence."   United States v. Allen, 956 F.3d 355, 358 (6th Cir. 2020)(citing Pepper v. United States, 562 U.S. 476, 487-93 (2011)).   See United States v. Gonzales, 547 F. Supp. 3d at 1139 ("The Court . . . will apply the § 3553(a) factors to Gonzales' pre-sentencing conduct as well as his conduct after the Court imposed his sentence in 2016."); United States v. Eccleston, 543 F. Supp. 3d at 1148-51 (concluding that the defendant's post-conviction history, including complete lack of disciplinary record and significant rehabilitation programming while incarcerated, outweighed the defendant's pre-conviction criminal history, particularly considering the defendant's young age at the time he committed the offense of conviction).

## ANALYSIS

The Court "generally 'may not modify a term of imprisonment once it has been imposed.'" Dillon v. United States, 560 U.S. 817, 819 (2010)(quoting 18 U.S.C. § 3582(c)).  In 2018, Congress created an exception to this general rule and allowed defendants who had exhausted their administrative remedies to petition district courts directly for compassionate release.  See 18

_____

of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . ."  United States v. Cage, 451 F.3d at 593.

U.S.C. § 3582(c)(1)(A).   After a defendant satisfies § 3582(c)(1)(A)'s exhaustion requirement, a district court may grant a motion for reduction of sentence only if three requirements are met: (i) the district court finds that extraordinary and compelling reasons warrant such a reduction; (ii) the district court finds that such a reduction is consistent with applicable policy statements that the Sentencing Commission issued; and (iii) the district court considers the factors set forth in § 3553(a), to the extent that they are applicable.   See Maumau, 993 F.3d at 821.   As a threshold matter, the Court concludes that Thompson has satisfied § 3582's administrative exhaustion requirement.   S. Milner, the Federal Correctional Institute, Florence ("FCI Florence") warden, received Thompson's request for compassionate release on November 16, 2020, see Email from A. Deaton to Justine Fox-Young (dated November 16, 2020), filed January 6, 2021 (Doc. 140-1), and, after receiving no response from Milner for more than thirty days, Thompson filed the Motion on January 6, 2021, see Motion at 1; 18 U.S.C. § 3582(c)(1)(A).

Thompson's primary argument is that his health conditions -- including his sarcoidosis and seizures -- warrant his release, because these conditions place Thompson at "extremely high risk for severe illness or death" if he should contract COVID-19.   Motion at 1.   The Court concludes that: (i) Thompson's medical conditions do not constitute "extraordinary and compelling reasons" meriting a reduction in his sentence; (ii) the sentence reduction that Thompson requests is not consistent with the U.S.S.G. § 1B1.13 Policy Statement nor any other policy statement that the Sentencing Commission has issued; and (iii) a reduction in Thompson's sentence does not align with the 18 U.S.C. § 3553(a) factors, because the seriousness of Thompson's offense and Thompson's extensive criminal history counsel that Thompson complete his sentence. Accordingly, the Court denies the Motion.

I.     THOMPSON'S    MEDICAL    CONDITIONS    AND    HIS    PARTICULAR
       VULNERABILITY TO SEVERE COVID-19 INFECTION DO NOT CONSTITUTE
       <u>EXTRAORDINARY AND COMPELLING REASONS</u>.

At the first step of the three-part compassionate release test, the Court determines whether

"extraordinary   and   compelling   reasons   warrant"   a   sentence   reduction.      18   U.S.C.

§ 3582(c)(1)(A)(i).   <u>See</u> <u>McGee</u>, 992 F.3d at 1042.   While the Court has "the authority to determine

what constitutes extraordinary and compelling reasons," <u>United States v. Hald</u>, 8 F.4th at 938 n.4,

this discretion "is bounded by the requirement under step two of the statutory test that a reduction

in sentence be consistent with applicable policy statements issued by the Sentencing Commission,"

<u>Maumau</u>, 993 F.3d at 832.   Thompson argues that his medical conditions and the correspondingly

heightened  risk  of  severe  COVID-19  infection  to  which  these  illnesses  subject  him  are

extraordinary and compelling reasons meriting his release.   <u>See</u> Motion at 6-8.   The United States

responds that Thompson's medical circumstances do not present extraordinary and compelling

reasons, despite that sarcoidosis is a listed condition, because Thompson receives adequate care in

prison and has refused the COVID-19 vaccine.   <u>See</u> Response at 17-23; Second Notice at 2.   For

the reasons discussed below, the Court concludes in its discretion that Thompson's circumstances

do not present extraordinary and compelling reasons.

A.     THOMPSON'S MEDICAL CONDITION IS NOT AN EXTRAORDINARY
       AND COMPELLING REASON.

First, Thompson's sarcoidosis, recurrent seizures, and sleep apnea do not, on their own,

constitute  extraordinary  and  compelling  reasons,  because  the  BOP  is  managing  properly

Thompson's care.   The Court has concluded that sleep apnea is a "relatively common health

problem[]," and as such, it is not "'very unusual.'"   <u>United States v. Gonzales</u>, 547 F. Supp. 3d at

1124 (quoting <u>New Oxford American Dictionary</u> 614 (3d ed. 2010), and citing <u>Basics of Sleep</u>

Apnea, Am. Coll. of Cardiology (January 8, 2013), https://www.acc.org/latest-in-cardiology/articles/2014/07/22/08/25/basics-of-central-sleep-apnea).   Likewise, that Thompson has experienced seizures while incarcerated is not "[b]eyond what is usual, customary, regular, or common."   Extraordinary, Black's Law Dictionary (11th ed. 2019).   While Thompson is correct that some courts have identified seizures as extraordinary and compelling reasons, see Motion at 11, Thompson's seizures are not as severe as the seizure disorders that defendants suffered in those cases.   In United States v. Bandrow, 473 F. Supp. 3d 778 (E.D. Mich. 2020)(Leitman, J.), for example, the defendant had "been hospitalized several times in the past with epileptic seizures," and epilepsy was a listed condition.   473 F. Supp. 3d at 782.   In United States v. Spencer, 519 F. Supp. 3d 237 (E.D. Pa. 2021)(Savage, J.), the defendant suffered "frequent grand mal seizures"[8] for which he was not receiving "necessary medical care."   519 F. Supp. 3d at 246.   Here, by contrast, the cause of Thompsons' seizures has not been identified as a serious medical condition, Thompson has only experienced seizures on two occasions, and Thompson is undergoing medical treatment and has received an MRI to determine the cause of the issue.   See FOF ¶ 35, at 8.   Cf. United States v. Spencer, 519 F. Supp. 3d at 246 (concluding that the defendant's seizure "condition combined with the lack of adequate medical treatment in prison" constituted extraordinary and compelling reasons where the defendant had yet to "receive a CT scan of his brain").

---

[8]Grand mal seizures are "intense seizures" that involve "extreme muscle spasms [that] may temporarily arrest breathing."   Tonic-Clonic (Grand Mal) Seizures, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/epilepsy/tonic-clonic-grand-mal-seizures.

This leaves only Thompson's sarcoidosis as a potential basis for finding an extraordinary and compelling reason for reducing his sentence. Thompson's sarcoidosis, however, does not constitute an extraordinary and compelling reason for his release, because Thompson's sarcoidosis is in remission, see FOF ¶ 34, at 7; cf. United States v. Huggins, No. 3:11-CR-15, 2021 WL 3025459, at *2 (W.D. Va. July 16, 2021)(Moon, J.)(reasoning that the defendant's respiratory illness did not constitute extraordinary and compelling reasons, because the defendant's medical records indicated that the condition was "in 'remission' and controlled" (quoting the record)), and because the BOP is effectively managing the condition through regular checkups, see FOF ¶ 35, at 8. For example, when Thompson became concerned that his sarcoidosis might be becoming active again, he underwent an x-ray and evaluation that confirmed there were "no notable changes" to Thompson's condition. FOF ¶ 38, at 8. See United States v. Eccleston, 543 F. Supp. 3d at 1140 ("S. Eccleston's medical difficulties do not present extraordinary and compelling circumstances, because the record indicates that the BOP manages effectively his chronic conditions . . . ."). In United States v. Brown, No. CR 19-106, 2022 WL 17986725 (W.D. Wash. December 29, 2022)(Lasnik, J.), the Honorable Robert S. Lasnik, United States District Judge for the United States District Court for the Western District of Washington, reasoned similarly that the defendant's sarcoidosis did not constitute an extraordinary and compelling reason, because the defendant's sarcoidosis was being "adequately addressed by the medical staff" at the defendant's prison. 2022 WL 17986725, at *4. The defendant in United States v. Brown, like Thompson, had recently "been seen by physicians" for his health concerns. 2022 WL 17986725, at *4. Accordingly, the Court concludes that none of Thompson's medical conditions, standing alone, are extraordinary and compelling reasons that warrant a reduction in his sentence.

**B.   THE INCREASED RISK OF SEVERE COVID-19 INFECTION THOMPSON'S MEDICAL CONDITIONS POSE IS NOT AN EXTRAORDINARY AND COMPELLING REASON.**

Thompson argues that the increased risk of severe COVID-19 infection that his medical conditions pose is an extraordinary and compelling reason warranting a reduction in his sentence. See Motion at 7-13.  As a threshold matter, if Thompson is to establish that the threat to him of COVID-19 supports his release under § 3582(c), he must, at the very least, demonstrate that his medical conditions make acquiring COVID-19 more likely or increase the risk that he will experience a severe case of COVID-19 upon contraction of the virus.  See United States v. Baca, 2020 WL 5369078, at *15.  Thompson meets this initial burden, because he has sarcoidosis, which is a listed condition.  See FOF ¶¶ 30-31, at 7.  As a listed condition, Thompson's sarcoidosis increases the risk that he will experience a severe case of COVID-19 should he contract the virus.  See FOF ¶ 31, at 7.  Nevertheless, that Thompson has been diagnosed with a listed condition does not automatically mean that he has demonstrated extraordinary and compelling reasons.  See United States v. Gonzales, 547 F. Supp. 3d at 1125.  Rather, the Court must evaluate Thompson's case "on an individualized basis," United States v. Gonzales, 547 F. Supp. 3d at 1125, and consider whether Thompson's COVID-19 risk is "[b]eyond what is usual, customary, regular, or common," Extraordinary, Black's Law Dictionary (11th ed. 2019).  Because Thompson declined the COVID-19 vaccine and already has experienced a mild case of COVID-19, in addition to the fact that Thompson's medical conditions are well-managed and his sarcoidosis is currently in remission, the Court concludes that the risk that COVID-19 poses to Thompson is not an extraordinary and compelling reason warranting his release.

Thompson refused a COVID-19 vaccine when it was offered to him, despite that he has no known medical contraindication to the vaccine.  See FOF ¶ 39 at 8.  The Court recently recognized that "an inmate's refusal to receive the COVID-19 vaccination weighs against a finding that the inmate's risk of contracting COVID-19 presents an extraordinary and compelling circumstance." United States v. Haworth, 2023 WL 8112827, at *11.  The great weight of authority from other courts accords with the conclusion that an inmate's unvaccinated status weighs against a finding of extraordinary and compelling reasons on the basis of COVID-19 risk, even where the defendant has sarcoidosis.  See, e.g., United States v. Culp, No. 22-1166, 2023 WL 6147185, at *3 (6th Cir. September 20, 2023)(affirming the district court's conclusion that the defendant had not demonstrated extraordinary and compelling circumstances where the defendant refused the COVID-19 vaccine, despite that the defendant suffered from sarcoidosis); United States v. Brown, 2022 WL 17986725, at *5 (holding that the defendant's sarcoidosis did not constitute an extraordinary and compelling reason, because, in part, the defendant had "not articulated a clear argument as to why he has continued to refuse vaccination"); United States v. Williams, 2021 WL 321904 (D. Ariz. February 1, 2021)(Rayes, J.)(finding the defendant's explanation for refusing the COVID-19 vaccine "incredible in light of his claim that his risk of a serious illness from the COVID-19 virus is an extraordinary and compelling reason for his immediate release").

The COVID-19 vaccination is particularly beneficial for individuals, like Thompson, who suffer from sarcoidosis.  See Michael Manansala et al., COVID-19 and Sarcoidosis, Readiness for Vaccination: Challenges and Opportunities, Frontiers in Medicine (Apr. 30, 2021)("We strongly recommend the administration of COVID-19 vaccines in patients with sarcoidosis."), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8119656; United States v. Greenlaw, No. 10-

- 42 -

0448, 2021 WL 1277958, at *7 (D. Me. April 6, 2021)(Woodcock, J.)("The risk-benefit analysis in favor of inoculation is so overwhelming that the Court holds Mr. Greenlaw's refusal to be vaccinated against his motion for compassionate release.").  The Court, like other courts that have considered the issue, is reluctant to credit Thompson's COVID-19 risk as an extraordinary and compelling circumstance where he has refused treatment that would substantially reduce this risk. Granting Thompson's request to be released would signal to those in federal custody that, by refusing to take preventative measures to safeguard one's own health, in addition to the health of other inmates, one improves his or her chance of obtaining compassionate release.  See United States v. Gonzalez Zambrano, No. 18-2002, 2021 WL 248592, at *5 (N.D. Iowa January 25, 2021)(Williams, J.)("It would be paradoxical to endorse a system whereby a defendant could [proffer] extraordinary and compelling circumstances for compassionate release" by refusing the "health care [offered] to them.").

In addition, Thompson has already contracted COVID-19.  See FOF ¶ 37 at 8.  The Court has previously concluded that a defendant's already having had COVID-19 weighs against a finding that the defendant's COVID-19 risk merits their release, because experiencing and recovering from COVID-19 means the defendant's "chances of contracting COVID-19 again are relatively low . . . ."  United States v. Eccleston, 543 F. Supp. 3d at 1140.  See United States v. Gonzales, 547 F. Supp. 3d at 1125 ("Gonzales' risk of contracting COVID-19 has decreased significantly since he filed this Motion, in part because Gonzales contracted COVID-19 already."). United States v. Alcazar, No. 23-2004, 2023 WL 8643189, at *4 (10th Cir. December 14, 2023)(affirming the district court's conclusion that, because the defendant "has recovered from COVID-19," her "diagnoses and conditions do not 'go beyond what is usual, regular, or common'"

(quoting the record)).  Moreover, that Thompson experienced no symptoms apart from a loss of taste and smell when he contracted COVID-19, see FOF ¶ 37 at 8, and that an x-ray performed shortly after Thompson's recovery from COVID-19 showed no change in his sarcoidosis, see FOF ¶ 38 at 8, further indicates that Thompson is not at risk of a severe COVID-19 case should he contract the virus again, see United States v. Wirichaga-Landavazo, 2023 WL 7166173, at *4 ("A district court does not abuse its discretion by finding that a defendant who has either refused (or received and benefited from) the COVID-19 vaccine fails to establish extraordinary and compelling reasons warranting a sentence reduction."); United States v. Hendon, No. CR 17-20469, 2021 WL 869652, at *3 (E.D. Mich. March 9, 2021)(Cox, J.)("Defendant has already been infected with the virus and recovered.  In light of that, this Court does not believe that Defendant has established extraordinary and compelling circumstances.").

Finally, the record demonstrates that BOP manages Thompson's conditions well and quickly scheduled a medical appointment when Thompson became concerned that his experience with COVID-19 may have worsened his sarcoidosis.  See FOF ¶ 38 at 8.  Cf. United States v. Gonzales, 547 F. Supp. 3d at 1126 (declining to find extraordinary and compelling reasons despite the "[t]he BOP's current neglect of Gonzales' medical conditions").  Thompson has not provided any evidence that he would receive better medical care outside of prison, nor that his risk of contracting COVID-19 again would be lessened if he was released into the community.  See United States v. Brady, 2020 WL 2512100 at *4 (S.D. N.Y. 2020)(Crotty, J.)(noting that that the defendant offered no substantive rationale why he would be any better off at his home where he would face the same risk of infection endured by the general public).  Vaccinations and COVID-19 booster shots have been made available to inmates at FCI Florence, see Third Notice at 1, and FCI Florence

has had only five covid-related deaths during the pandemic, see <u>Inmate COVID-19 Data</u>, Fed. Bureau of Prisons (March 18, 2024), www.bop.gov/about/statistics/statistics_inmate_covid19.jsp; <u>United States v. Wirichaga-Landavazo</u>, 2023 WL 7166173, at *4 (holding that "the district court properly concluded that Wirichaga-Landavazo had not presented an extraordinary and compelling reason for a sentence reduction" where the district court considered "the current risk of infection at his facility").   Because neither Thompson's medical conditions, nor Thompson's increased COVID-19 risk are "[b]eyond what is usual, customary, regular, or common," <u>Extraordinary</u>, Black's Law Dictionary (11th ed. 2019), the Court concludes that there are no extraordinary and compelling reasons warranting Thompson's compassionate release.

## II.   THE EXTRAORDINARY AND COMPELLING REASONS THAT THOMPSON OFFERS ARE INCONSISTENT WITH SENTENCING COMMISSION POLICY STATEMENTS.

Even if the Court were to conclude that Thompson's case presents extraordinary and compelling reasons, these reasons must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  As discussed in greater detail <u>supra</u>, at 28-30, the Tenth Circuit held in <u>Maumau</u>, 993 F.3d 821, and <u>McGee</u>, 992 F.3d 1035, that the U.S.S.G. § 1B1.13 policy statement was not applicable to motions for compassionate release, like Thompson's, that were filed by the defendant as opposed to the BOP director.  In the November 1, 2023, amendments to § 1B1.13, however, the Sentencing Commission expressly makes the policy statement applicable to compassionate release motions brought by defendants.  <u>See</u> U.S.S.G. § 1B1.13, Reasons for Amendment ("The amendment revises § 1B1.13(a) to reflect that a defendant is now authorized to file a motion under 18 U.S.C. § 3582(c)(1)(A), making the policy statement applicable to both defendant-filed and BOP-filed motions."),

https://www.ussc.gov/guidelines/amendment/814.   Consequentially, the Court concludes that

U.S.S.G. § 1B1.13 is now an applicable policy statement and that the Court must, therefore,

consider whether a reduction in Thompson's sentence would be "consistent" with § 1B1.13.  See

United States v. Mulder, No. CR 16002-062, 2024 WL 382048, at *2 (N.D. Okla. January 31,

2024)(Heil, III, J.)("When evaluating a motion for reduction, the court is restrained by applicable

law, [including the] newly revised § 1B1.13 . . . ."); United States v. Moreira, No. CR 06-20021,

2024 WL 378032, at *3 (D. Kan. January 31, 2024)(Vratil, J.)("On November 1, 2023, the

Sentencing Commission issued an applicable policy statement for motions for compassionate

release filed by defendants."); United States v. Feliz, No. CR 16-0809, 2023 WL 8275897, at *4

(S.D.N.Y. November 30, 2023)(Marrero, J.)("[T]o grant a motion for compassionate release, a

court must now, in addition to finding that the other elements of the compassionate release standard

are satisfied, also find that granting such relief is consistent with Policy Statement 1B1.13 . . . .").

　　　While Thompson filed his Motion before the amendments to the § 1B1.13 policy statement

became effective on November 1, 2023, see Motion at 1, the Court nonetheless concludes that

§ 1B1.13 is applicable in its current, amended form.  While § 1B1.13 is silent whether the policy

statement applicable on the date of the defendant's compassionate release motion or the policy

statement applicable on the date the court decides the motion is applicable, the court finds helpful

Sentencing Commission guidance on other policy statements and provisions of U.S.C. § 3582(c).

See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Text, 180 (2012)("Scalia &

Garner")("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").  The Sentencing Commission provides in U.S.S.G. § 1B1.10[9]:

> Consistent with subsection (a) of §1B1.11 (Use of Guidelines Manual in Effect on Date of Sentencing), the court shall use the version of this policy statement that is in effect on the date on which the court reduces the defendant's term of imprisonment as provided by 18 U.S.C. § 3582(c)(2).

U.S.S.G. § 1B1.10 cmt. n.9.  U.S.S.G. § 1B1.11 states, similarly, that, when imposing a sentence under 18 U.S.C. § 3583, "the court is to apply the guidelines and policy statements in effect at the time of sentencing."  U.S.S.G. § 1B1.11 cmt. backg'd.  If the Sentencing Commission consistently advises that courts should apply the policy statement in effect on the date the court takes action, the harmonious-reading canon provides that § 1B1.13 should similarly be applied in the form it takes when the court passes judgement on the defendant's motion.  Scalia & Garner at 180-82 (outlining a preference for construing provisions "together and in harmony" rather than "by critical analysis of a single provision").  Other district courts in the Tenth Circuit have taken the same approach since the new amendments to § 1B1.13 became effective.  See, e.g., United States v. Sosa, No. CR 20-0073, 2023 WL 9002764, at *2 (D. Utah December 28, 2023)(Sam, J.)(applying "[t]he Sentencing Commission's November 1, 2023 amendment to the compassionate release policy statement" to a motion for compassionate release filed on October 19, 2023); United States v. Mulder, No. 19-CR-0157, 2023 WL 8621945, *1-2 (N.D. Okla. December 13, 2023)(Heil, III,

---

[9]U.S.S.G. § 1B1.10 provides guidance where courts consider a potential reduction in a defendant's prison term as a result of a subsequent change in the guideline range applicable to the defendant under 18 U.S.C. § 3582(c)(2).  See U.S.S.G. § 1B1.10(a)(1).

J.)(applying the "newly revised § 1B1.13" to the defendant's compassionate release motion, which was "filed on September 28, 2023").[10]

Two sections of § 1B1.13 are potentially consistent with Thompson's circumstances.  First, § 1B1.13(b)(1)(B)(i) provides that extraordinary and compelling reasons exist where the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13(b)(1)(B).  Second, § 1B1.13(b)(1)(D) states that the court may find extraordinary and compelling reasons where

> (i)      the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

> (ii)     due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

> (iii)    such risk cannot be adequately mitigated in a timely manner.

---

[10]Even if the new § 1B1.13 policy statement does not apply, the Court's result does not change.  Pursuant to McGee and Maumau, the Court need not consider the version of § 1B1.13 in place at the time Thompson filed his Motion, because the previous version of § 1B1.13 did not apply to motions for compassionate release filed by inmates.  See United States v. Gonzales, 547 F. Supp. 3d at 1131-32 ("Here, because Gonzales -- rather than the Warden -- filed the Motion, 'the Sentencing Commission's most recent policy statement, which was issued prior to the First Step Act, is not applicable to [his] motion.'" (quoting McGee, 992 F.3d at 1050)).  Accordingly, were the previous version of § 1B1.13 to apply, the Court would skip the second step of its compassionate release analysis and dismiss the Motion solely on the grounds that Thompson has not demonstrated extraordinary and compelling reasons and that the § 3553(a) factors do not support Thompson's release.

U.S.S.G. § 1B1.13(b)(1)(D).  The Court considers § 1B1.13(b)(1)(B)(i) and § 1B1.13(b)(1)(D) in turn and concludes that Thompson's proffered extraordinary and compelling reasons are not consistent with either subsection.

First, Thompson's medical conditions are not consistent with § 1B1.13(b)(1)(B)(i) of the policy statement.  Thompson's sarcoidosis, seizures, and sleep apnea are not sufficiently "serious" to be consistent with this factor.  U.S.S.G. § 1B1.13(b)(1)(B)(i).  Thompson is classified as a Level-1 inmate, "the lowest of BOP's four medical care levels."  Response at 19.  See FOF ¶ 40, at 8. Cf. United States v. Mulder, 2023 WL 8621945, at *4 ("Defendant's healthcare level remains at Level 3 . . . which is defined as outpatient care for inmates that have complex, and usually chronic health conditions that require frequent clinical contacts to maintain control and stability of their condition(s) . . . .").   Specifically, Thompson's sarcoidosis is managed adequately and in remission, see FOF ¶¶ 33-35, at 7-8, and his experience with seizures has not been linked to a serious underlying medical condition, see FOF ¶ 36, at 8.  Cf. United States v. Vanholten, No. CR 12-0096, 2023 WL 8357739, at *2 (M.D. Fla. December 1, 2023)(Dalton Jr., J.)(concluding that the defendant's medical condition was consistent with § 1B1.13(b)(1)(B)(i) where the defendant's "sarcoidosis is both chronic and persistent," and where the United States moved jointly for the defendant's compassionate release).  Moreover, Thompson's conclusory statement that "[t]here is no question that the combination of Mr. Thompson's conditions diminishes his ability to provide self-care within the prison,"  Motion at 6, does not establish that he cannot provide self-care in prison, because the BOP adequately addresses Thompson's conditions and has consistently provided Thompson with medical attention, United States v. Smith, 856 F. App'x 804, 806 (11th Cir. 2021)(explaining that, even where a defendant establishes that he or she has a serious medical

condition, he or she still must present evidence showing that the condition rises to such a level that the defendant can no longer provide self-care while incarcerated). Cf. United States v. Vanholten, 2023 WL 8357739, at *2 (concluding that the defendant's sarcoidosis diminished the defendant's ability to provide self-care where he was not receiving enough "[f]ollow-up appointments," because "medical personnel have acknowledged the staffing shortage causes significant strain, and inmates have complained about poor healthcare because of it").

Second, Thompson's medical conditions are not consistent with § 1B1.13(b)(1)(D). FCI Florence has had only five covid-related deaths during the pandemic. See Inmate COVID-19 Data, Fed. Bureau of Prisons (March 18, 2024), www.bop.gov/about/statistics/statistics_inmate_covid19.jsp. Cf. United States v. Mulder, 2023 WL 8621945 (determining that the defendant's serious medical conditions were consistent with § 1B1.13(b)(1)(D)(i), in part because the defendant was housed at FCC Butner, where forty inmates have died of COVID-19). Despite that Thompson's sarcoidosis places him at an increased risk of a severe COVID-19 case, see FOF ¶¶ 30-31, at 7, that Thompson has already had COVID-19 and experienced almost no symptoms, see FOF ¶ 38 , at 8, establishes that Thompson's COVID-19 risk does not rise to the level that § 1B1.13(b)(1)(D)(ii) contemplates. In addition, the COVID-risk at FCI Florence can be "adequately mitigated in a timely manner," U.S.S.G. § 1B1.13(b)(1)(D), because the BOP has offered vaccinations and boosters to all inmates, and when Thompson experienced a mild case of COVID-19, the BOP monitored whether the illness may have exacerbated Thompson's inactive sarcoidosis, see FOF ¶¶ 38, 41, at 8.

Finally, even if Thompson presents circumstances commensurate with § 1B1.13, relief would not be appropriate for Thompson, because the Court concludes that Thompson presents a

danger to the community.  U.S.S.G. § 1B1.13 "limits relief to those defendants who are 'not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).'" United States v. Lopez, 487 F. Supp. 3d 1156, 1159 (D.N.M. 2020)(Vázquez, J.)(quoting U.S.S.G. § 1B1.13(2)).  See United States v. Gamboa, 467 F. Supp. 3d 1092, 1102 (D.N.M. 2020)(Parker, J.)("Before reducing or modifying a defendant's sentence, a court must consider whether a defendant is dangerous to the community."); United States v. Holroyd, 464 F. Supp. 3d 14, 19 (D.D.C. 2020)(McFadden, J.)("If a defendant still poses a danger to the community or if the balance of factors under § 3553(a) favor continued imprisonment, these are independent reasons to deny a motion for compassionate release.").  "[T]he nature and circumstances of the offense charged," 18 U.S.C. § 3142(g)(1), which here involved the possession of numerous guns, see United States v. Gamboa, 467 F. Supp. 3d at 1102 ("Defendant's offense, a methamphetamine crime committed while in possession of a gun, is undoubtedly a serious crime."), and Thompson's violent "history and characteristics," 18 U.S.C. § 3142(g)(3); see FOF ¶¶ 9-25, at 4-6, both compel the conclusion that Thompson presents a danger to the community's safety, cf. United States v. Gamboa, 467 F. Supp. 3d at 1102 (concluding that the defendant "does not pose a significant threat to public safety," because the defendant was "mostly confined to his bed and is unable to stand for more than short periods of time").  Accordingly, the Court concludes that Thompson's proffered extraordinary and compelling reasons are not consistent with any applicable Sentencing Commission policy statement.

## III.   REDUCING THOMPSON'S SENTENCE IS NOT CONSISTENT WITH THE APPLICABLE § 3553(a) FACTORS.

Having analyzed whether extraordinary and compelling reasons exist that may warrant a reduction of sentence, the Court must next consider the factors set forth in section § 3553(a), to

the extent that they are applicable, to determine whether a reduction is warranted.  See McGee,

992 F.3d at 1042.  Even where defendants establish extraordinary and compelling reasons

warranting their release that are consistent with applicable policy statements, the Court's

consideration of the § 3553(a) factors may serve as an independent bar to the reduction of a

defendant's sentence.  See United States v. Wirichaga-Landavazo, 2023 WL 7166173, at *4

("[E]ven if Wirichaga-Landavazo had presented extraordinary and compelling reasons for a

sentence reduction, the district court did not abuse its discretion in denying Wirichaga-

Landavazo's compassionate release motion based on the § 3553(a) factors.").  The Court applies

the § 3553(a) factors both to Thompson's pre-sentencing conduct and to his conduct after the

Honorable C. Leroy Hansen, United States District Judge for the United States District Court for

the District of New Mexico, imposed his sentence in 2014.  See United States v. Gonzales, 547

F. Supp. 3d at 1137 (citing United States v. Allen, 956 F.3d at 358).  Thompson argues that his

difficult upbringing, his "clear conduct" and rehabilitation efforts during his incarceration, and the

substantial amount of time he already has served tilt the § 3553(a) factors in his favor.  Motion at

12-13.  The Court concludes that, even if Thompson presents extraordinary and compelling reasons

for his release that are consistent with an applicable Sentencing Commission policy statement, the

§ 3553(a) factors weigh against Thompson and counsel against any reduction in Thompson's

sentence.

First, "the nature and circumstances of the offense and the history and characteristics of"

Thompson weigh against a reduced sentence.  18 U.S.C. § 3553(a)(1).  Thompson's underlying

offense involves the possession of more than a dozen firearms and thousands of rounds of

ammunition.  See FOF ¶¶ 22-23, at 5-6.  Gun violence and the use of firearms during the

commission of other offenses remains a significant problem in the community in which Thompson was arrested.  See Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico, N.M. Dep't of Health (September 29, 2023)("Over the past two decades, New Mexico's firearm death rates rose from seventh highest  nationwide in 1999 to third highest in 2021 with the age-adjusted firearm death rate increasing by 87% between 2010 and 2021."); Age-Adjusted Death Rate for Firearm Fatalities, Suicide With a Firearm, & Homicide With a Firearm in New Mexico, 2018-2021, Office of the Governor (highlighting a "70% increase in homicides with a firearm since 2018"), www.governor.state.nm.us/gun-violence-dashboard; Mayor Keller, APD Outline Plan to Address Gun Violence, City of Albuquerque (April 8, 2019)("For nearly a decade, gun violence has become ever more pervasive and is often connected to other crimes."), www.cabq.gov/police/news/mayor-keller-apd-outline-plan-to-address-gun-violence.      Courts commonly decline to find the § 3553(a)(1) factor favors a defendant's release where the defendant's underlying conviction is serious and involves firearm possession.  See, e.g., United States v. Dempsey, 567 F. Supp. 3d 284, 290 (D.D.C. 2021)(McFadden, J.)("[I]llegally possessing a firearm, as Dempsey admits, 'is serious.'" (quoting the record)); Lawrence v. United States, 570 F. Supp. 3d 524, 530 (W.D. Ky. 2021)(Russell, J.)(concluding that the statutory sentencing factors did not support granting  the defendant's motion for compassionate release where the defendant was "convicted of possessing a sawed-off shotgun and for being a felon in possession of a firearm").

Furthermore, the seriousness and extensiveness of a defendant's criminal history is an important consideration when determining whether § 3553(a)(1) weighs in favor of a defendant's release.  Thompson's criminal history is extensive, and Thompson has been convicted of numerous

violent crimes, including multiple instances of domestic violence, battery upon a peace officer, and attempted first-degree murder.  See FOF ¶¶ 2-7, at 3-4; United States v. Dempsey, 567 F. Supp. 3d at 290 ("Dempsey's history and characteristics also favor continued detention.  Dempsey has three convictions -- one for armed robbery and two for controlled substances.").  As an "armed career criminal," Thompson's criminal history category is VI, the highest possible category.  PSR ¶ 58 at 28.  See United States v. Ocampo, 650 F. Supp. 3d 578, 585 (E.D. Mich.)(Ludington, J.)("His numerous convictions cover nearly 10 pages of his presentence report and result in 153% of the criminal-history points required for the highest category in the Sentencing Guidelines."), reconsideration denied, 655 F. Supp. 3d 622 (E.D. Mich. 2023); Lawrence v. United States, 570 F. Supp. 3d at 530 (reasoning that the § 3553(a) factors did not warrant the defendant's release where her "criminal history calculation was the highest possible category VI").

Furthermore, while the Court commends Thompson's efforts to rehabilitate and educate himself while incarcerated, see FOF ¶ 43, at 9, these efforts do "not outweigh the serious nature of the crime or the need to afford adequate deterrence to it."  United States v. Simon, 642 F. Supp. 3d 610, 616 (E.D. Mich. 2022)( Ludington, J.).  That Thompson has been incarcerated for serious offenses and reoffended shortly after his release on these occasions also weighs against his motion for compassionate release.  See FOF ¶¶ 5-6, at 3 (describing Thompson's convictions for domestic violence in 2002 and for attempted murder in 2003); United States v. Hargrove, 30 F.4th 189, 199 (4th Cir. 2022)(recognizing that the defendant's "return to the same behavior after serving time for his first conviction 'demonstrated his lack of respect for the law and showed that his first prison sentence did not deter him from continuing to commit drug crimes'" (quoting the district court)). Cf. United States v. Jones, 980 F.3d 1098, 1115 (6th Cir. 2020)(remarking that the defendant's

conviction of "a nonviolent drug offense" and the fact that he "had no juvenile adjudications" were relevant to the conclusion that § 3553(a)(1) weighed in favor of the defendant's release). Having considered the nature of Thompson's offense of conviction and Thompson's violent criminal history, the Court concludes that § 3553(a)(1) weighs against Thompson's release.

The considerations that § 3553(a)(2) describes also weigh against Haworth's release. If the Court reduces Thompson's sentence, the new sentence would be insufficient to reflect Thompson's offense, promote respect for the law, and provide just punishment. See 18 U.S.C. § 3553(a)(2)(A); Lawrence v. United States, 570 F. Supp. 3d 530 (holding that "releasing Defendant early would minimize the seriousness of her crimes, fail to afford adequate deterrence to criminal conduct, and would be unjust in light of the serious nature of her crimes," where the defendant's "criminal history contains multiple convictions including violent assaults, threats of violence, drug possession, and robbery"). It also is imperative that the Court deter others in Thompson's community -- where the use of firearms to commit crimes of violence remains a serious issue -- from committing the serious offense to which Thompson pled guilty. See 18 U.S.C. § 3553(a)(2)(B). Additionally, given Thompson's lengthy and violent criminal history, Thompson must serve the rest of his sentence "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C); United States v. Mathews, 557 F. Supp. 3d 1057 (E.D. Cal. 2021)(Mueller, J.)(weighing the defendant's "recidivism risk" under § 3553(a)(2)(C)). Finally, while the Court cannot and will not use incarceration for rehabilitative purposes, see United States v. Story, 635 F.3d 1241, 1245-47 (10th Cir. 2011)(holding that "sentencing courts may not increase the term of incarceration to advance rehabilitative goals," because "increasing incarceration to promote rehabilitative goals is not permitted under § 3582(a)"), the Court observes that

Thompson's sentence as originally imposed effectively provides Thompson "with needed educational or vocational training, medical care, or other correctional treatment" from which Thompson may continue to benefit.   18 U.S.C. § 3553(a)(2)(D).   See FOF ¶ 43, at 9. Consequentially, § 3553(a)(2) weighs against Thompson's release.

Neither "the kinds of sentences available," nor "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission . . . subject to any amendments made to such guidelines," support a reduction in Thompson's sentence.   18 U.S.C. § 3553(a)(3)-(4).   Thompson's sentence of 180 months, see Judgment at 2, was below the Guideline range at the time Thompson was sentenced, see PSR ¶ 110, at 41 ("Based upon a total offense level of 31 and a criminal history category of VI, the Guideline imprisonment range is 188 months to 235 months."); United States v. Gonzales, 547 F. Supp. 3d at 1139 ("[B]ecause Gonzales already received a sentence which could have been much higher, § 3553(a)(3)-(4) do not support any reduction on Gonzales' sentence.").   Moreover, Thompson's sentence still would be below the Guideline range were he sentenced for his federal crime today, because Thompson's Guideline range remains 188 to 235 months.   See United States Sentencing Commission, Guidelines Manual, Ch.5, Pt.A (Nov. 2023).

Section 3553(a)(5) requires the Court to "consider . . . any pertinent policy statement" in determining a sentence.   18 U.S.C. § 3553(a)(5).   The Court has discussed in detail the U.S.S.G § 1B.13 policy statement, see Section II, supra, at 42-48, which is applicable.   The Court concludes, however, that Thompson's medical conditions and COVID-19 risk are not consistent with § 1B.13, see Section II, supra at 47-48, so the policy statement carries little weight in the

Court's determination, at this juncture, whether the § 3553(a) analysis would be the same today as it was when Thompson was sentenced.   Beyond § 1B.13, the Court finds no Sentencing Commission policy statements, and Thompson presents none, that apply to this case.   Section 3553(a)(5), therefore, is a neutral factor.

The sixth factor, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), counsels against Thompson's release.   Thompson already has received a sentence below the Guideline imprisonment range that the PSR calculates.   See PSR ¶ 110, at 41; Judgment at 2.   In the United States District Court for the District of New Mexico in 2014, a minority of defendants whose primary offense, like Thompson's, involved the possession of firearms, received a sentence below the Guideline imprisonment range.   See U.S. Sent'g Comm'n, Statistical Information Packet,   Fiscal   Year   2014,   District   of   New   Mexico   18   (2014), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2014/nm14.pdf.   Because Thompson's guilty plea provided him with a below-guideline sentence, were the Court to consider § 3553(a)(6) anew, increasing, rather than reducing, Thompson's sentence would, therefore, better "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).   Finally, Thompson was not ordered to pay any restitution, so § 3553(a)(7) is a neutral factor.   See Judgment at 5; PSR ¶ 120, at 42 ("Restitution is not applicable in this case.").

Having considered the sentencing factors set forth in 18 U.S.C. § 3553(a), the Court concludes that compassionate release is not appropriate in this case, because it would undermine the goals of Thompson's original sentence and of § 3553(a).   Because the § 3553(a) factors must

support a defendant's release before a Court may grant a compassionate release motion, the § 3553(a) factors constitute an additional "alternative ground[]" for the denial of Thompson's Motion. United States v. Wirichaga-Landavazo, 2023 WL 7166173, at *4. Accordingly, the Court denies Thompson's motion for compassionate release, because: (i) there are no extraordinary and compelling reasons meriting Thompson's release; (ii) Thompson's proffered extraordinary and compelling reasons are not consistent with Sentencing Commission policy statements; and (iii) the pertinent factors under § 3553(a) do not favor a reduction in Thompson's sentence.

**IT IS ORDERED** that the Defendant's Motion for Compassionate Release, filed January 6, 2021 (Doc. 140), is denied.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Alexander M. M. Uballez
  United States Attorney
Paige Messec
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

_Attorneys for the Plaintiff_

Justine Fox-Young
Justine Fox-Young, P.C.
Albuquerque, New Mexico

-- and --

Virginia Grady
  Federal Public Defender

Federal Public Defender's Office, District of Colorado
Denver, Colorado

*Attorneys for the Defendant*